**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMIE HENSLEY, | : | |
|       Plaintiff, | : | CIVIL ACTION |
| | : | No. 15-6098 |
|       v. | : | |
| BUCKS COUNTY | : | |
| CORRECTIONAL FACILITY, et al., | | |
|       Defendants. | : | |

**August _11, 2016**                                              **Anita B. Brody, J.**


**<u>MEMORANDUM</u>**

Plaintiff Jamie ("Jayden") Hensley brings suit under 42 U.S.C. §§ 1983 and 1985 against

Defendants Arlene Barats, Frank Bochenek, Lillian Budd, Tienne Davis, Jamie DiPasquo,

Jacquelyn Gill, Gregory S. Landis, William F. Plantier, Amy Joy Pomales,[1] Kimberly Roldan-

Santiago,[2] Gregory Vingless, Christine Willis, Terrance P. Moore, Captain J, John Does 1-50,

and Bucks County Correctional Facility ("BCCF").  Hensley is a female to male transgender

individual.  Although Hensley is biologically female, he identifies as male and prefers the use of

male pronouns when referring to him.  Am. Compl. ¶¶ 6, 7.  Hensley alleges that Defendants

conspired to deprive him of the equal protections of the law in violation of § 1985.  Hensley also

raises the following § 1983 claims against Defendants: deliberate indifference to his serious

medical needs in violation of the Eighth and Fourteenth Amendments; denial of access to the

---

[1] Pomales is incorrectly referred to in the Amended Complaint as "Officer Polomolus."  *See* Am. Compl.

[2] Roldan-Santiago is incorrectly referred to in the Amended Complaint as "Officer Santago."  *See* Am. Compl.

courts in violation of the First Amendment; violation of the Equal Protection Clause of the Fourteenth Amendment; retaliation in violation of the First Amendment; and a *Monell* claim. I exercise federal question jurisdiction over Hensley's §§ 1983, 1985 claims pursuant to 28 U.S.C. § 1331.

Gill, Pomales, DiPasquo, Vingless, Bochenek, Moore, Davis, Barats, Willis, Roldan-Santiago, Landis, Budd, and Plantier (collectively, "Individual Defendants") have filed motions to dismiss.[3]  BCCF has also filed a motion dismiss.  For the reasons set forth below, I will grant Individual Defendants' motions to dismiss.  I will grant in part and deny in part BCCF's motion to dismiss: I will deny BCCF's motion to dismiss the *Monell* claim against it, and I will grant BCCF's motion to dismiss the rest of the claims against it.

# I. BACKGROUND[4]

Jamie ("Jayden") Hensley is a female to male transgender individual.  Although Hensley is biologically female, he identifies as a male.  Hensley lives as a male, and has been diagnosed by a physician as suffering from Gender Identity Disorder ("GID").  Hensley was prescribed testosterone, a hormone replacement therapy ("HRT"), as treatment for his transition to male. Hensley took HRT for many years.

On or about November 18, 2013, Hensley began his incarceration at BCCF.  Hensley was housed in the female population at BCCF.  At the time Hensley was processed into BCCF, he informed the officer that he was transgender and had been diagnosed as suffering from GID.  On the next day, Hensley told mental health workers that he was transgender, had a GID diagnosis, and had been on HRT.  Hensley requested that his HRT continue during his incarceration at

---

[3] Captain J and John Does 1-50 have not moved to dismiss the Amended Complaint.

[4] All facts are taken from the Amended Complaint and construed in the light most favorable to Hensley. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

BCCF.  Hensley was told that he would be given HRT if he could provide medical records showing his need for HRT.

On or about December 29, 2013, Hensley was in his room during a lock down, which meant that his door could only be opened by an employee of BCCF.  Hensley heard the door unlock and two inmates, Blythestone and Weeks, entered his room and blocked the door.  Officer Joy Pomales had unlocked the door to allow Blythestone and Weeks to enter Hensley's room. Pomales routinely called Hensley "Miss Hensley," while calling the other inmates by their last names without using "Miss."  Additionally, Pomales routinely told Hensley, "'you are on a female block – you are female,' or used other words meant to cause anguish to [Hensley]."  Am. Compl. ¶ 51.

When Blythestone and Weeks entered the room, they said to Hensley, "we want to see your 'penis,' and Polomolus [sic] is curious too."[5]  *Id.* ¶ 42.  Hensley asked Blythestone and Weeks to leave, but they refused and demanded to see Hensley's penis.  After being trapped in the cell for five minutes, suffering from fear and anxiety, Hensley pulled down his shorts in an effort to get Blythestone and Weeks to leave without hurting him.  Blythestone and Weeks left the room laughing and the door was locked again.  Blythestone and Weeks then went and spoke with Pomales who began to laugh.  The incident humiliated Hensley and caused extreme anxiety and stress.

The same day as the incident, Hensley filled out a "Green Slip," the form used by inmates to file complaints.  Hensley addressed the following Green Slip to Sergeant Gregory Vingless and Captain J:

> I was in my room before 12:30 p.m. lock down two inmates Melissa
> Blythestone and Weeks came into my room asking about my sexual organs &

---

[5] "Females by birth who take testosterone to transition to male often see an increase in the size of their clitoris, which is then referred to as a 'penis.'"  Am. Compl. ¶ 42 n.1.

were badgering me to show them.  I waited til 2nd shift to tell the officer cause these inmates claimed Ofc Polomolus [sic] also was curious.  My roommate was also in our room. Our door was locked so an officer had to pop our door for those inmates to get in our room.  Now I feel very uncomfortable.

*Id.* ¶ 54.  As a result of Hensley's complaint, Blythestone and Weeks were sent to solitary confinement for two days.

On December 30, 2013, Cancro and Chell, friends of Blythestone and Weeks, told Hensley that they planned to get him in trouble on his work release because he had "ratt[ed]" on Blythestone and Weeks.  Hensley filled out a Green Slip about the threat made by Cancro and Chell.  *Id.* ¶ 56.

On or about January 8, 2014, Hensley's "medical records and testosterone were received by BCCF."  *Id.* ¶ 59.  Hensley went to the infirmary to receive his HRT.   The doctor told Hensley "that she (the doctor) had been threatened by BCCF – 'if I give you the hormones I will be fired.'"  *Id.* ¶ 60.  Hensley began making complaints about the lack of HRT.

On January 15, 2014, Chief Investigator Frank Bochenek issued a Misconduct Report, alleging that Hensley had sexually assaulted another inmate, who happened to be friends with Blythestone, Weeks, Cancro, and Chell.  Without any investigation, Hensley was sent to solitary confinement for forty days.

On January 17, 2014, Hensley appealed to Warden Terrance P. Moore by submitting a "written statement about the disparate treatment he was receiving, and complained that he did not feel safe."  *Id.* ¶ 64.

Hensley remained in solitary confinement, where he was only permitted to shower three times per week in a small closet, and he was not allowed to go outside, allegedly because of inclement weather.  Hensley did not receive testosterone while in solitary

confinement.  He became depressed and attempted suicide with the string from his sweatpants.  Because BCCF does not have a separate space for inmates on "suicide watch," Hensley was kept in solitary confinement.

By March 2014, Hensley was let out of solitary confinement for a brief period of time in which he complained in writing, on multiple occasions, of his need for HRT. Specifically, on March 12, 2014, Hensley complained in writing about the lack of HRT to Assistant Warden Lillian Budd, who was "responsible for the delivery and quality of the medical and behavioral health services provided to prisoners at BCCF," *id.* ¶ 21, stating that "he was being subjected to discrimination based on his 'gender issues,'" *id.* ¶ 70. On that same day, Hensley complained that "he was being subject to cruel and unusual punishment." *Id.*

On March 18, 2014, Hensley again requested HRT, and stated that he was experiencing moodiness, periods, and "undue mental stress."  *Id.* ¶ 71.  The Medical Department responded to Hensley, "[W]e do not give hormone replacement therapy here. Sorry."  *Id.* ¶ 72.  Hensley then replied to the BCCF's statement:

> It could be arranged.  This is so important to me because I have fought so hard to get on hormones.  I've lost my family and all and now I am starting to get depressed and feel like I am about to lose my mind.  I didn't have thoughts of hurting or killing myself while on HRT.  I could be assured when I made decisions they were rational ones.  I feel less grounded and like I am out of place.

*Id.* ¶ 73.  As a result of this statement, Hensley was referred to a doctor for depression.

On that same day, March 18, 2014, Officer Tienne Davis falsely accused Hensley of inappropriately touching another inmate. Hensley was not given an opportunity to defend himself and was sent to solitary confinement for ten days.

On March 19, 2014, Hensley complained, in writing:

5

> Are you aware that to deprive me of my hormone replacement therapy may result in psychological issues to resurface - which is happening -along with serious complications such as high blood pressure muscle wasting & neurological problems. These hormones are medically needed for me and to deprive me of them serves no penological [sic.] purpose & amounts to torture.

*Id.* ¶ 76.  In response, the Medical Administrator stated, "we do not give hormone therapy here." *Id.* ¶ 77.

On March 23, 2014, Hensley complained, in writing, to Moore, "I am tired of my rights being violated."  *Id.* ¶ 78.

By the end of March 2014, "in direct retaliation for the numerous complaints [Hensley] made about what he perceived to be a violation of his rights under the Constitution . . . [Officer Jamie] DiPasquo took away evidence [Hensley] had accumulated in preparation of filing the instant lawsuit."  *Id.* ¶ 79.  On March 30, 2014, Hensley complained, in writing, to Vingless.

During a room search, BCCF staff found a story that Hensley had written, before his incarceration, as part of his therapy.  When the BCCF staff read the story, they called Hensley "sick and demented."  *Id.* ¶ 82.  Hensley was placed in solitary confinement for nine days because of the story.  A newspaper later published the story to serve as an inspiration to the transgender community.

In early April 2014, Hensley "was again retaliated against" when Officer Davis again falsely accused Hensley of sexual misconduct.  *Id.* ¶ 85.  Hensley responded to the charges: "[B]ecause people don't understand my lifestyle I am being harassed by both staff and inmates.  I have the right to be treated as a human being and that has not happened the whole time I have been here."  *Id.* ¶ 86.  On April 14, 2014, Hensley was sent to solitary confinement for ten days.  On April 22, 2014, Hensley requested to speak with Moore, but his request was denied.

6

On April 28, 2014, Hensley received a memorandum from Director William F. Plantier, stating that his "appeal of a grievance relating to his gender claims was reviewed and that the appeal was being sent to 'medical staff.'" *Id.* ¶ 89.

Hensley had been issued a "binder" to minimize his breasts.  On May 18, 2014, Hensley requested a new binder because his was broken.  BCCF responded, "[W]e do not issue chest binders." *Id.* ¶ 97.

On May 19, 2014, "in direct retaliation for [Hensley's] protected conduct," Officer Arlene Barats wrote Hensley up for alleged contraband.  *Id.* ¶ 99.

By Memorial Day 2014, Hensley became depressed without his testosterone and binder, and made a second suicide attempt by trying to drink cleaning chemicals.  Hensley was again sent to solitary confinement.

In August 2014, Hensley's roommate falsely accused him of assault.  The roommate was reprimanded for lying, but in the meantime, Hensley was placed in solitary confinement.  Hensley was told that he would not have another roommate in order to avoid any more false accusations.

"When [Hensley] was removed from the hole and was being taken to a new room, he discovered that he was being placed with a roommate; therefore, [Hensley] said to [Gill], 'I'm suicidal put me on suicide watch.'" *Id.* ¶ 105.  Gill replied, "don't talk about it, be about it." *Id.* ¶ 106.  In response, Hensley tied a sheet around his neck and attempted to jump off the second floor landing.  Hensley was placed back in solitary confinement.  While Hensley was in solitary confinement, BCCF "removed the pages of [its] handbook that dealt with transgender issues to prevent [Hensley] from researching his legal claims." *Id.* ¶ 109.

While Hensley was at BCCF, Officers Christine Willis and Kimberly Roldan-Santiago "routinely singled [him] out [] for discrimination based on his non-conformity to sex stereotypes, and used words meant to cause anguish to [Hensley]." *Id.* ¶¶ 93, 96. In reference to Hensley, Willis stated, "It needs its binder washed. I don't know why we need to do that." *Id.* ¶ 91. Willis told Hensley, "you are just a girl that wants to be a boy," and "you are just confused." *Id.* ¶ 92. Additionally, "[b]y way of example only," Willis consistently made comments to Hensley that he was a "predator," a "pedophile," a "whale," and a "blimp." *Id.* ¶ 94. Officer Roldan-Santiago routinely called Hensley "Miss Hensley," but called other inmates by their last names without using "Miss." *Id.* ¶ 95.

Hensley made multiple written complaints to Captain Gregory S. Landis "about the unlawful conduct he had been subjected to based on his non-conformity to sexual stereotypes and the retaliation he had suffered as a result of voicing complaints of unlawful conduct." *Id.* ¶ 110. "The complaints to Landis fell on deaf ears." *Id.* ¶ 111.

While at BCCF, Hensley spent more than six months in solitary confinement. On or about October 2014, Hensley finished his term of incarceration at BCCF.

## II. STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered . . . ." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (citations omitted).  Thus, a court may "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).  Further, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III. DISCUSSION

### A. Section 1985 Conspiracy Claim

A conspiracy claim under 42 U.S.C. § 1985(3) is a cause of action for any person injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3).  To establish a violation of § 1985(3), a plaintiff must allege and prove:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983).

Defendants move to dismiss Hensley's § 1985(3) claim because he has not sufficiently alleged the existence of a conspiracy.[6]  Although "caution is advised in any pre-trial disposition of conspiracy allegations in civil rights actions . . . , the rule is clear that allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action."  *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 184-85 (3d Cir. 2009) (citation omitted).  In his Amended Complaint, Hensley simply makes the conclusory statement that Defendants "conspired" to deprive him of the equal protection of the laws, or of equal privileges and immunities under the laws, but fails to provide a single factual allegation to support the existence of the elements of a conspiracy. Therefore, I will grant Defendants' motions to dismiss Hensley's § 1985 conspiracy claim.[7]

## B. Section 1983 Claims

In order to establish liability under 42 U.S.C. § 1983, Hensley "must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury."[8]  *Elmore v. Cleary*, 399 F.3d 279, 281 (3d

---

[6] Hensley voluntarily dismisses his conspiracy claim against BCCF.  *See* Pl.'s Br. Opp'n to Def. BCCF's Mot. Dismiss at 24 [hereinafter Pl.'s Br. Opp'n to BCCF].

[7] Although Hensley has insufficiently alleged a conspiracy claim, the existence of a conspiracy is not inconceivable.  If discovery related to the remaining claims reveals a factual basis for an alleged conspiracy, then Hensley may seek to amend the Amended Complaint.

[8] There is no dispute that Defendants were acting under color of law.  Defendants dispute that they

Cir. 2005).  Section 1983 does not create any new substantive rights, rather it provides a remedy for violations of other federal or constitutional or statutory rights.  *Doe v. Delie*, 257 F.3d 309, 314 (2001).

### 1. Section 1983 Claims Against BCCF

The parties agree that Hensley's suit against BCCF is a suit against Bucks County. Under § 1983, a county can only be liable when the alleged constitutional injury implements or executes a policy, regulation or decision officially adopted by the local government or informally adopted by custom.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  Additionally, under some circumstances, a county may be liable under § 1983 for failure to train its employees.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 380 (1989). A claim against a local government based on its policies, customs, and/or failure to train its employees is known as a *Monell* claim. *See, e.g., McTernan v. City of York, PA*, 564 F.3d 636, 641 (3d Cir. 2009).  While a county may be held liable for a *Monell* claim, a "[c]ounty may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in *respondeat superior*."  *Mulholland v. Gov't Cty. of Berks, Pa*., 706 F.3d 227, 237 (3d Cir. 2013).  Thus, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell*, 436 U.S. at 694.

Hensley brings a *Monell* claim against BCCF for its violation of the Eighth Amendment's ban against cruel and unusual punishment based on BCCF's policies, customs, and failure to properly train its employees.  I will deny BCCF's motion to dismiss Hensley's *Monell* claim because he has alleged sufficient facts to state a claim.[9]

---

violated any of Hensley's constitutional rights.

[9] Hensley also brings his *Monell* claim against Individual Defendants in their official capacities.  "A suit against a governmental official in his or her official capacity is treated as a suit against the governmental

Hensley brings the remainder of his claims against BCCF for constitutional injuries inflicted solely by its employees.  In these claims, he does not allege that the constitutional violations he suffered were the result of BCCF's policies, customs, or a failure to properly train its employees.  Because BCCF cannot be held vicariously liable for the actions of its employees, I will grant BCCF's motion to dismiss the rest of Hensley's claims.[10]

### 2. Section 1983 Claims Against Individual Defendants

Individual Defendants contend that they are protected from suit under § 1983 by qualified immunity.  "Qualified immunity protects government officials from insubstantial claims in order to 'shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"  *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 168 (3d Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Id.* at 735. Individual Defendants argue that they are entitled to qualified immunity because they did not

---

entity itself."  *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004).  I will dismiss the *Monell* claim against Individual Defendants because it is duplicative of the *Monell* claim against BCCF.  *See Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988) (finding that claims "against the defendant officials in their official capacities, are only a duplication of the counts asserted against the Township itself"); *Kean v. Henry*, No. 09-567, 2012 WL 646053, at *3 (E.D. Pa. Feb. 28, 2012) (dismissing claims brought against the individual defendants in their official capacities as duplicative of the claims against the municipal employers).

[10] Hensley voluntarily withdraws his claim under § 1983 for punitive damages against BCCF.  *See* Pl.'s Br. Opp'n to BCCF at 24.

violate any of Hensley's constitutional rights.[11]

In order to sufficiently state a § 1983 claim against an individual, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Id.* Individual Defendants argue that Hensley has not sufficiently pled the elements of the claims, and has failed to allege personal involvement by Individual Defendants. For the reasons below, Hensley fails to state a claim against Individual Defendants for any violation of his constitutional rights. Therefore, Individual Defendants are entitled to qualified immunity.

### a. First Amendment Access to the Courts Claim Under § 1983

Prisoners have a fundamental constitutional right of access to the courts under the First and Fourteenth Amendments. *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (citing *Lewis v. Casey,* 518 U.S. 343, 346 (1996)). Where prisoners claim that a defendant's actions have inhibited their ability to present a past legal claim, they must show: "(1) that they suffered an 'actual injury'—that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that they have no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access suit." *Id.* (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). "To that end, prisoners must satisfy certain pleading requirements: The complaint must describe the underlying arguable claim well enough to show that it is 'more than mere hope,' and it must describe the 'lost remedy.'" *Id.* at 205-06 (quoting *Christopher*, 536 U.S. at 416-17).

---

[11] Additionally, Individual Defendants argue that even if Hensley's constitutional rights were violated, they were not clearly established at the time.

Individual Defendants move to dismiss Hensley's access to the courts claim on the basis that Hensley has failed to allege that he suffered an actual injury. The allegations in the Amended Complaint related to Hensley's access to the courts claim are: (1) DiPasquo took away evidence that Hensley had collected in preparation for filing the instant lawsuit, and Hensley complained to Vingless after the materials were confiscated; (2) BCCF removed pages of its handbook that dealt with transgender issues to prevent Hensley from researching his legal claims; and (3) "Defendants . . . remov[ed] pertinent sections of legal resources and [] confiscate[ed] [Hensley's] research, notes and evidence," Am. Compl. ¶ 141. Hensley fails to allege that Individual Defendants actions caused him to lose any remedy. I will grant Individual Defendants' motions to dismiss Hensley's access to the courts claim because he has not alleged that he suffered an actual injury.

### b. First Amendment Retaliation Claim Under § 1983

To establish a First Amendment claim for retaliation, a plaintiff must show that: "(1) he engaged in constitutionally protected conduct, (2) he was subjected to adverse actions by a state actor, and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action." *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011). To constitute an adverse action, the alleged retaliation must be "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Id.* (citation omitted). "[A] failure to act on a complaint is not a retaliatory or adverse action sufficient to sustain a First Amendment retaliation claim." *L.H. v. Pittston Area Sch. Dist.*, 130 F. Supp. 3d 918, 934 (M.D. Pa. 2015); *see also Monn v. Gettysburg Area Sch. Dist.*, 553 F. App'x 120, 122 (3d Cir. 2014) ("Allegations of inaction are insufficient to maintain a claim for retaliation."). Moreover, "[i]t is only intuitive that for protected conduct to be a substantial or motiving factor in a[n] [adverse]

decision, the decisionmakers must be aware of the protected conduct." *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) (citing *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002) (explaining that in a First Amendment retaliation case, "[i]n order to retaliate against an employee for his speech, an employer must be aware of that speech")).  Thus, a First Amendment retaliation claim necessarily fails if the defendant who subjected the plaintiff to an adverse employment action was unaware that the plaintiff had engaged in a protected activity. *See id.*

Hensley's allegations related to his First Amendment retaliation claim are deficient.  The only constitutionally protected conduct that Hensley alleges he engaged in is "filing grievances and lodging complaints about violations of his constitutional rights."  Am. Compl. ¶ 151.  Hensley's allegations as to Barat, Bochenek, Davis, DiPasquo, Gill, Roldan-Santiago, and Willis are insufficient because Hensley does not allege that these Defendants were aware that he engaged in any constitutionally protected conduct.[12]  Hensley's allegations as to Pomales are insufficient because Hensley does not allege that he engaged in any constitutionally protected conduct before Pomales let Blythestone and Weeks into his cell to see his penis.  Hensley's allegations as to Budd, Landis, Plantier, Vingless, and Moore are insufficient because Hensley does not allege that these Defendants took any adverse action against him.  Therefore, I will grant Individual Defendants' motions to dismiss Hensley's First Amendment retaliation claim.

### c. Equal Protection Claim Under § 1983

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  "This is essentially a direction that all persons similarly situated should be

---

[12] Although Hensley states that Barats, Davis, and DiPasquo retaliated against him, Hensley does not allege a single fact to support this legal conclusion.

treated alike." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  "In order to bring a successful section 1983 claim for the denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. In other words, they must demonstrate that they received different treatment from that received by other individuals *similarly situated*." *Id.* (citation omitted).  A plaintiff's claim will fail if "he does not allege the existence of similarly situated individuals" who were treated differently than plaintiff. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).

Moreover, where the alleged differential treatment "consists solely of speech, there is no equal protection violation." *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999), *decision clarified on reh'g*, 186 F.3d 633 (5th Cir. 1999).  "Standing alone, simple verbal harassment does not  . . . deny a prisoner equal protection of the laws." *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000); *see also Gannaway v. Berks Cty. Prison*, 439 F. App'x 86, 91 (3d Cir. 2011) (verbal harassment alone does not violate the Equal protection clause); *Abuhouran v. Acker*, No. 04-2265, 2005 WL 1532496, at *4 (E.D. Pa. June 29, 2005) (same); *cf. Blades v. Schuetzle*, 302 F.3d 801, 805 (8th Cir. 2002) ("[T]he use of racially derogatory language, unless it is pervasive or severe enough to amount to racial harassment, will not by itself violate the [F]ourteenth [A]mendment.").

Hensley's allegations related to his equal protection claim are deficient.  Hensley's allegations as to DiPasquo, Vingless, Bochenek, Moore, Budd, Davis, Plantier, Barats, Gill, and Landis are insufficient because Hensley does not allege that these Defendants treated him differently than any other inmate.  Hensley's allegations as to Roldan-Santiago and Willis are insufficient because Hensley only alleges that these Defendants made offensive comments to

him; this conduct that consists solely of speech does not violate the Equal Protection Clause.

Hensley's allegations as to Pomales are insufficient because Hensley does not allege that

Pomales treated him differently than other similarly situated individuals when Pomales permitted

two inmates to enter Hensley's cell to see his penis. Additionally, Pomales' routine reference to

Hensley as "Miss Hensley," while only calling other inmates by their last names without using

"Miss," is a verbal comment that is insufficient to rise to the level of an equal protection

violation. Therefore, I will grant Individual Defendants' motions to dismiss Hensley's equal

protection claim.[13]

### d. Eighth Amendment Deliberate Indifference Claim Under § 1983

A prison official's "deliberate indifference to serious medical needs of prisoners" violates

the Eighth Amendment's ban against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S.

97, 104 (1976). To establish a violation of the Eighth Amendment, a prisoner must prove: (1)

deliberate indifference on the part of the prison officials; and (2) a serious medical need.

*Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

"[M]ere allegations of malpractice" or "mere disagreement as to the proper medical treatment"

do not constitute deliberate indifference. *Id.*

> To be liable on a deliberate indifference claim, a defendant prison official must
> both 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety.'
> *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The knowledge element of
> deliberate indifference is subjective, not objective knowledge, meaning that the
> official must actually be aware of the existence of the excessive risk; it is not
> sufficient that the official should have been aware.

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001).

---

[13] When read as a whole, the allegations in the Amended Complaint suggest that Hensley may have been treated differently than similarly situated individuals because of his failure to conform to gender norms. Hensley fails, however, to allege that any Individual Defendant was personally involved in a violation of his rights under the Equal Protection Clause.

The deliberate indifference requirement is met "[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'"  *Monmouth*, 834 F.2d at 346 (citation omitted).  "Similarly, where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,' the deliberate indifference standard has been met."  *Id.* (citation omitted).  Additionally, "deliberate indifference is demonstrated '[w]hen . . . prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to physician capable of evaluating the need for such treatment.'"  *Id.* at 347 (citation omitted).

Hensley alleges that Individual Defendants violated the Eighth Amendment by failing to provide a binder for his chest, failing to provide HRT, and failing to prevent his suicide attempts. Individual Defendants move to dismiss Hensley's Eighth Amendment claims on the basis that he has not alleged deliberate indifference on the part of any Individual Defendant.

### i. Deliberate Indifference Claims for Failure to Provide a Binder and Failure to Provide HRT

Hensley's allegations related to his deliberate indifference claims for failure to provide a binder and failure to provide HRT are deficient.  Hensley's allegations as to all Individual Defendants, related to the failure to provide a binder, are insufficient because Individual Defendants were neither aware of Hensley's request for a new binder nor involved in the denial of that request.  Hensley's allegations as to Pomales, DiPasquo, Vingless, Bochenek, Moore, Davis, Barats, Gill, Willis, Roldan-Santiago, and Landis, related to the failure to provide HRT, are insufficient because these Defendants were neither aware of Hensley's request for HRT nor involved in the denial of that request.  Hensley's allegations as to Budd and Plantier, related to the failure to provide HRT, are insufficient.  Hensley merely alleges that he complained to Budd

"about the lack of HRT," and that Plantier sent his appeal of a grievance relating to his gender claims to medical staff. Although Budd and Plantier may have been aware of Hensley's request for HRT, Hensley does not allege that either Budd or Plantier denied or prevented Hensley from receiving HRT.  Therefore, I will grant Individual Defendants' motions to dismiss Hensley's deliberate indifference claims for failure to provide a binder and failure to provide HRT.

### ii. Deliberate Indifference Claim for Failure to Prevent Suicide Attempts

The Third Circuit has recognized that a "particular vulnerability to suicide" is a serious medical need. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991).  In a prisoner suicide case, a plaintiff bears the burden of establishing three elements: "(1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability."[14]  *Id.* (citation omitted).   While *Colburn* used the phrase "knew or should have known," the "Third Circuit later acknowledged that . . . use of the phrase . . . was erroneous in light of *Farmer v. Brennan*, 511 U.S. 825 (1994), which held that Eighth Amendment liability requires actual awareness of risk."  *Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (citing *Serafin v. City of Johnstown*, 53 F. App'x 211, 213 (3d Cir. 2002)).  Moreover, while *Colburn* alternately used the phrases "reckless indifference" and "deliberate indifference," "[i]n light of *Farmer*, . . . it seems preferable to use the term 'deliberate indifference' exclusively."  *Serafin*, 53 F. App'x at 213 n.1.  Thus, a plaintiff bears the burden of establishing that a prison official knew of a prisoner's particular vulnerability to suicide and acted with

---

[14] Although *Colburn* set forth this standard in the context of a Fourteenth Amendment due process claim of a pretrial detainee, it relied heavily on *Estelle v. Gamble*, 429 U.S. 97 (1976), which addressed Eighth Amendment claims alleging inadequate medical care.  *See Colburn*, 946 F.2d at 1023-24; *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 320 n.5 (3d Cir. 2005) ("[I]n developing our jurisprudence on pre-trial detainees' suicides we looked to the Eighth Amendment, which prohibits the infliction of cruel and unusual punishment on convicted prisoners . . . .").

deliberate indifference to that prisoner's vulnerability.

For a prisoner to have a "particular vulnerability to suicide," "there must be 'a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.'" *Colburn*, 946 F.2d at 1024 (citation omitted).  If a strong likelihood of suicide exists, a plaintiff must then show that the custodial official knew of that strong likelihood.  *See id.*

> The "strong likelihood" of suicide must be "so obvious that a lay person would easily recognize the necessity for" preventative action, the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.

*Id.* at 1025 (citation omitted).  "Custodians have been found to 'know' of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." *Id.* at 1025 n.1.

In his Amended Complaint, Hensley alleges that at the beginning of his incarceration, he notified BCCF that he was transgender and suffering from GID.  Sometime in January or February 2014, Hensley attempted suicide with a string from his sweatpants.  Hensley remained in solitary confinement because BCCF does not have a separate location for suicide watch.  At some point, Hensley was released from solitary confinement.  On March 18, 2014, Hensley requested HRT, and told someone at BCCF that he was experiencing "undue mental stress." Am. Compl. ¶ 71.  The Medical Department denied Hensley's request for HRT.  Hensley responded to the denial of HRT by stating: "I've lost my family and all and now I am starting to get depressed and feel like I am about to lose my mind.  I didn't have thoughts of hurting or killing myself while on HRT." *Id.* ¶ 73.  Hensley was referred to a doctor for depression.  On March 19, 2014, Hensley again complained, stating: "Are you aware that to deprive me of my

hormone replacement therapy may result in psychological issues to resurface - which is happening."  *Id.* ¶ 76.  By Memorial Day 2014, Hensley made a second suicide attempt by trying to drink cleaning chemicals.  Hensley was again put in solitary confinement.  In August 2014, Hensley's roommate accused him of sexually assaulting her.  Hensley was again placed in solitary confinement.  Hensley was told that, in order to avoid anyone falsely accusing him of sexual assault, he would not have another roommate.  "When [Hensley] was removed from the hole and was being taken to a new room, he discovered that he was being placed with a roommate; therefore, [Hensley] said to [Gill], 'I'm suicidal put me on suicide watch.'"  *Id.* ¶ 105. Gill, responded to Hensley, "don't talk about it, be about it."  *Id.* ¶ 106.  Hensley then tied a sheet around his neck and attempted to jump off the landing of the second floor.

By the time of Hensley's second suicide attempt, there was a strong likelihood that Hensley would harm himself.  Hensley has sufficiently alleged that he had a particular vulnerability to suicide.  Hensley's allegations related to his deliberate indifference claim for failure to prevent his suicide attempts are deficient, however, because Hensley has not alleged that Individual Defendants knew of his particular vulnerability to suicide.  The Amended Complaint is devoid of any allegation that Pomales, DiPasquo, Vingless, Bochenek, Moore, Davis, Barats, Willis, Roldan-Santiago, Landis, Budd, and Plantier had any awareness that Hensley was suicidal.  Thus, these Defendants were not aware of Hensley's particular vulnerability to suicide.

Only one allegation in the Amended Complaint alleges any personal involvement on the part of a Defendant: "When [Hensley] was removed from the hole and was being taken to a new room, he discovered that he was being placed with a roommate; therefore, [Hensley] said to [Gill], 'I'm suicidal put me on suicide watch.'"  *Id.* ¶ 105.  The Amended Complaint does not

allege that Gill knew of Hensley's prior suicide attempts, complaints to BCCF, GID diagnosis, and failure to receive HRT.  Gill only knew that, as she was taking Hensley to a new room to be placed with a roommate, Hensley told her that he was suicidal.  This single comment was not an "obviously serious suicide threat." *Colburn*, 946 F.2d at 1025 n.1.  Gill's failure to appreciate Hensley's risk of self-inflicted injury does not "evidence[] an absence of any concern for the welfare of . . . her charge[]." *Id.* at 1025.  Gill was not deliberately indifferent to Hensley's risk of suicide because Gill was not actually aware of Hensley's particular vulnerability to suicide. *Green v. Coleman*, 575 F. App'x 44, 48 (3d Cir. 2014) (dismissing claim because the plaintiff failed to allege that the defendant knew or should have known of the plaintiff's risk of suicide where the plaintiff alleged that he had told the defendant on one occasion "to contact the psychological department because he felt suicidal" and four times attempted suicide, but did not allege that the defendant was aware of the attempts).

Therefore, I will grant Individual Defendants' motions to dismiss Hensley's deliberate indifference claim for failure to prevent Hensley's suicide attempts.[15]

## IV. CONCLUSION

For the reasons set forth above, I will grant Individual Defendants' motions to dismiss. I will grant in part and deny in part BCCF's motion to dismiss: I will deny BCCF's motion to dismiss the *Monell* claim against it, and I will grant BCCF's motion to dismiss the rest of the claims against it.

The *Monell* claim against BCCF and all claims against Defendants Captain J and John Does 1-50 are still pending.  If discovery related to the remaining Defendants reveals further personal involvement on the part of any dismissed Defendant that rises to the level of a

---

[15] When read as a whole, the allegations in the Amended Complaint suggest that Hensley may have been subject to cruel and unusual punishment.  Hensley fails, however, to allege that any Individual Defendant was personally involved in a violation of his rights under the Eighth Amendment.

constitutional violation, then Hensley may seek to amend the Amended Complaint to reinstate

that dismissed Defendant.


s/Anita B. Brody

_____

ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: